AO 91 (REV.5/85) Criminal Complaint AUSA Jessica Romero (312)353-4137

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DAVID YEN LEE

**MAGISTRATE JUDGE SCHENKIER**

**CRIMINAL COMPLAINT**

CASE NUMBER: 09 CR 290

FILED
MAR 27 2009
03/27/2009
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief.

Beginning no later than March 2009, in Wheeling, Illinois and Arlington Heights, Illinois, in the Northern District of Illinois, Eastern Division, DAVID YEN LEE, defendant herein, did knowingly (1) steal, and without authorization appropriate, take, carry away, and conceal, and by fraud, artifice, and deception obtain; and (2) without authorization copy, duplicate, download, upload, replicate, transmit, and convey one and more trade secrets that are related to and included in a product that is produced and placed in interstate and foreign commerce, for the economic benefit of anyone other than any owner of the trade secrets, intending and knowing that the offense would injure any owner of the trade secret, in violation of Title 18, United States Code, Section 1832 (a)(1) and (2).

I further state that I am Special Agent with the Federal Bureau of Investigation (FBI) and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

 Signature of Complainant
 ERIC D. SHIFFMAN
 Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

March 27, 2009 at Chicago, Illinois
Date City and State

Sidney I. Schenkier, U.S. Magistrate Judge Signature of Judicial Officer
Name & Title of Judicial Officer

| | |
|---|---|
| UNITED STATES DISTRICT COURT | ) |
| | ) ss |
| NORTHERN DISTRICT OF ILLINOIS | ) |

## AFFIDAVIT

I, Eric D. Shiffman, being duly sworn state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately three and a half years. I am currently assigned to the Chicago Division, National Security Squad. In my capacity as a Special Agent, I have received specialized training and have investigated violations of federal criminal laws and regulations, including offenses relating to theft of intellectual property, economic espionage, and theft of trade secrets, in violation of Title 18, United States Code, Section 1832. I have received special training in economic espionage and theft of trade secrets and have participated in investigations involving economic espionage and theft of trade secrets. I have also participated in the execution of multiple federal search warrants in other types of cases involving violations of federal law.

2. This affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint charging that defendant David Yen Lee, did knowingly steal, or without authorization appropriate, take, carry away or copy, duplicate, download, and replicate a trade secret that is related to or included in a product that is produced or placed in interstate or foreign commerce, for the economic benefit of anyone other than the owner of the trade secret, intending or knowing that the offense will injury any owner of that trade secret in violation of Title 18, United States Code, Section 1832.

3. The information in this affidavit is based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited

purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish a foundation of probable cause necessary to support the requested criminal complaint.

## FACTS SUPPORTING PROBABLE CAUSE

### OVERVIEW

4. According to its annual report, Valspar Corporation ("Valspar") is the fifth largest North American manufacturer of paints and coatings, with annual global net sales reaching nearly $ 3.5 billion as of 2008. Valspar supplies customers in more than 100 countries and is supported by 57 manufacturing sites, 39 laboratories, and nearly 9,400 employees worldwide. Valspar's products are made, bought, and sold in interstate and foreign commerce.

5. According to immigration records, Lee was born in Taiwan and has been a naturalized citizen of the United States since 1993. According to his resume, Lee has a Bachelors of Science Degree in Chemistry from Tunghai University in Taiwan and received a Ph.D. in Physical Organic Chemistry from the University of Illinois at Champagn-Urbana in 1985. Lee has several years of experience working as a chemist developing new technologies for pharmaceutical, specialty chemical, coating, ink and colorant related industries. Lee is proficient in the Chinese language.

6. According to Valspar records, Lee became employed as the "Technical Director of New Product Development" for Valspar's Architectural Group, located at 1191 Wheeling Road, Wheeling, Illinois in May 2006. Lee's employment responsibilities included scouting new paint manufacturing technologies, conducting experiments for paint coloring, and coordinating with other Valspar national and international laboratories. Lee was also responsible

for the initiation and operation of Valspar's research and development laboratory initiative abroad.

7. According to Lee's Valspar supervisor, Paul S. Sara, on March 16, 2009, approximately two weeks after returning from a business trip to the People's Republic of China ("PRC"), Lee abruptly resigned his employment at Valspar effective immediately. On that date, Lee relinquished his AT & T Wireless Blackberry device and a laptop computer.

8. According to Valspar Network Analyst Hyder M. Farooqie, on March 18, 2009, Valspar examined the contents of the laptop computer relinquished by Lee on March 16, 2009 ("the work computer"). The search of the work computer revealed the following: first, Valspar discovered all of the computer's temporary files, emails, and browser history had been deleted, which suggests Lee had taken steps to clean his computer user history. Second, Valspar found a hidden file containing unauthorized software programs including a data copying program. Third, as forth in further detail in this affidavit, approximately 44 gigabytes[1] of data, including trade secret information, had been downloaded without authorization from Valspar's computer server onto Lee's work computer. Among the data found on Lee's work computer was trade secret information developed by Valspar in connection with products for one of Valspar's largest domestic customer. The account for this customer worth an estimated $600 million to Valspar based on annual sales.

---

[1] Webster's Online Dictionary defines "gigabyte" as "1,073,741,824 bytes = 1024 megabytes. Roughly the amount of data required to encode a human gene sequence." *See* <http://www.websters-online-dictionary.org/definition/gigabyte>.

9. According to Valspar employees as well as Lee's business networking profile, as detailed further in this affidavit, Lee has accepted employment for a competitor paint company with offices in PRC.

10. Lee has booked a one way airline ticket on United Airlines flight 835 from Chicago O'Hare International Airport to Shanghai, PRC, scheduled for departure on March 27, 2009, at 10:00 a.m.

11. Lee is a resident at 400 West Rand Road, Apartment B303, Arlington Heights, Illinois ("the Premises"). On March 26, 2006, the FBI executed a search warrant of the Premises and, as set forth in further detail in this affidavit, found Valspar trade secrets both in electronic form.

## LEE'S WORK COMPUTER

12. The following information was obtained from Valspar Network Analyst Hyder M. Farooqie and Lee's Valspar supervisor, Paul S. Sara:

13. The work computer Lee returned to Valspar on March 16, 2009, contained various software programs that were unauthorized under Valspar's Electronic Mail and Computer Access Policy (as set forth in further detail below). Among these unauthorized software programs, was a program called SyncToy 2.0 for Windows ("SyncToy 2.0"). SyncToy 2.0 is a software program designed to copy, move, rename, and delete files between folders, external drives, or different computers. More specifically, SyncToy 2.0 is a program used to continuously synchronize files and data between different data storage folders or devices. This type of program was not authorized for use on company computers based on Valpar's Electronic Mail and Computer Access Policy.

4

14. Valspar's computer examination revealed that, using SyncToy 2.0, Lee copied and downloaded data from Valspar's secured databases onto the work computer. As a result of SyncToy 2.0's automated synchronization feature, the program copied and updated any new data that was stored within Valspar files onto Lee's work computer Analysis of the work computer revealed that the program was copying and downloading Valspar files to Lee's work computer and, in turn, the files were copied and downloaded to an additional external electronic storage device which was attached or connected to Lee's work computer.

15. Among the data that was copied by SyncToy 2.0 onto Lee's computer and copied onto an external device were: (a) a folder named "DYL" containing approximately 3.4 gigabytes of data, including Microsoft Outlook folders containing e-mail files; (b) a folder named "My Documents," which was uploaded from the work computer to an external device on March 10, 2009; and (c) a folder named "R&D" containing approximately 40 gigabytes of data, including files in sub-folders named "Formulas," "Marketing," and "New Technology." This data was uploaded from the work computer to an external device on March 10, 2009. As set forth in further detail in this affidavit, some of these sub-folders contained trade secrets. Based upon the volume of information transferred, there may have been multiple external storage devices such as portable hard drives or laptop computers attached to Lee's work computer, which would have enough storage space to accommodate approximately 44 gigabytes of data.

16. SyncToy 2.0 was downloaded onto Lee's work computer as early as November 2008. Around that time Lee had requested that Valspar's Technical Service department assign him a new company laptop computer with greater data storage capacity. The Valspar laptop originally assigned to Lee contained approximately 80 gigabytes of storage

capacityquested a new laptop with approximately 240 gigabytes of available storage capacity. Lee was assigned and provided the new laptop computer on or about November 10, 2008. The first detected synchronization using SyncToy 2.0 occurred on November 12, 2008.

## THE TRADE SECRETS

17. The following information was obtained from a Valspar Network Analyst Hyder M. Farooqie and Lee's Valspar supervisor, Paul S. Sara:

18. As a result of his position at Valspar, Lee had access to three different databases containing trade secrets. One database storesValspar's trade secret information in the form of proprietary chemical formulas, paint properties calculations, and emerging research and development information. Lee also had access to sensitive production information contained on two additional databases, which contain Valspar's regulatory, safety, storage, transport and related business practices. The loss of sensitive data contained within any of these databases to a competitor would result in a substantial financial loss to Valspar.

19. The "Formulas" sub-folder found on Lee's work computer contained spreadsheets of trade secret information, including raw materials information, and chemical formulas and calculations, compiled from trade secret information on various internal Valspar databases. The trade secret data contained in the spreadsheets on Lee's work computer had been developed for products for one of Valspar's largest domestic customers. This account alone is worth an estimated $600 million to Valspar based on annual sales.

20. Valspar maintains several security measures in places to ensure the confidentiality of its trade secrets. Valspar's Wheeling, Illinois facility is secured and can be accessed only with employee identification badges and key cards.

21. Valspar also has in place a series of company policies and regulations, as well as confidentiality and non-disclosure agreements with employees and third-parties, in order to protect its trade secrets and other proprietary information.

22. On May 25, 2006, Lee signed a Certificate of Compliance stating that Lee received, read, and understood Valspar's Code of Ethics and Business Conduct Policy ("the Code").

23. Paragraph 2 of the Code requires that upon termination, any employee of Valspar surrender any document, letter or other papers, instruments, film or computer storage devices in his/her possession or control relating Valspar operations, business practices or affairs, and that all information relating to Valspar's business shall deemed confidential unless it is generally known or available to the public.

24. Paragraph 15 of the Code sets forth that Valspar employees have a continuing obligation to safeguard confidential corporate information, including trade secrets, after the employee leaves Valspar.

25. Paragraph 16 of the Code provides that "One of Valspar's most important assets is its confidential corporate information. Valspar's legal obligations and its competitive position often mandate that this information remain confidential." This information includes information and data on Valspar's internal operations and research and development, such as customer lists, customer pricing, supplier pricing, rebates, sourcing/supplier information, chemical formulas, and confidential production techniques, (confidential information used in the course of business to give Valspar a competitive advantage). Valspar endeavors to keep this information confidential indefinitely.

26. On May 25, 2006, Lee also signed an "Invention and Confidentiality Agreement" with Valspar, wherein he agreed not to release or disclose company confidential information, including trade secrets, consumer lists, research and development, and trade secrets or confidential information which he developed or learned during the scope of his employment.

27. Under the terms of the Invention and Confidentiality Agreement signed by Lee, Lee does not have any proprietary interests in any technology he developed through his employment at Valspar.

28. Valspar's Electronic Mail and Computer Access Policy prohibits employees from loading or running any software program on Valspar's computer system which has not been authorized by Valspar. SyncToy 2.0 is not an authorized software program.

29. Valspar also maintains electronic security measures in place to protect its trade secrets. The three Valspar databases containing trade secrets and other confidential business information are password protected and access is restricted among Valspar employees. An employee must be specifically authorized and issued a personal password in order to access the data contained on all three databases.

30. Valspar maintains electronic access records, such as computer logs, to monitor security on these databases as well as its entire computer system. With respect to the database specifically designed to store Valspar's trade secret information, Valspar collects historical log-on information for each authorized employee.

31. The Valspar computer system is protected by firewall. The three password protected databases are protected by firewall as well.

32. Specific trade secret formulas and documents containing these formulas are marked "Valspar Company Confidential" or "Valspar Internal Use Only" by Valspar for security purposes. Documents marked "Valspar Company Confidential" and "Valspar Internal Use Only" were found on Lee's work computer and were transferred using the unauthorized software program SyncToy 2.0 to an external device.

### LEE'S NEW EMPLOYMENT

33. According to Valspar records, Lee traveled for Valspar to the PRC approximately four times in 2008 in order to work on paint formulas. On or about February 20, 2008, Lee and his Valspar work colleague, Individual A, traveled to the PRC to facilitate research for Valspar's PRC subsidiary Huarun Limited ("Huarun"). Lee was present at the Huarun facility from February 23, 2009, through February 26, 2009. While at the Huarun facility, Lee participated in lab projects, lab findings, and management discussions.

34. According to Individual A, a Valspar employee traveling with Lee to visit the Huarun facility, Lee solicited information about trade secret formulas and materials developed at Huarun specifically for the PRC market while at the Huarun facility. According to Individual A, Lee aggressively sought data from Huarun relating to Huaran research on competitor products, including a particular competitor by the name of Nippon Paint.

35. According to Huarun employees, Lee has accepted employment with Nippon Paint, the largest paint manufacturer in Asia and a Valspar competitor both in Asia and the United States. Lee's first day of work with Nippon Paint in PRC is set to be April 1, 2009.

36. As of March 24, 2009, Lee maintained a LinkedIn professional networking website page. LinkedIn is a business networking website that provides its members with a

network to locate, meet, and collaborate with different kinds of professionals. When an individual joins LinkedIn, he/she creates a personal profile that summarizes professional expertise and accomplishments. Lee's own personal profile on LinkedIn states Lee was the former Technical Director of Development for Valspar from 2006 until March 2009. Lee's profile shows his current employment as a "GM of Technology, Asia at A Major Paint Company in Asia" and as the "VP of Technology, China at A Major Paint Company in Asia." In his profile, Lee states he has in-depth knowledge of coating/specialty chemical/pharmaceutical and biocides industries. Sometime between March 21, 2009 and March 24, 2009, Lee's profile was updated to reflect the full name of the institution, as set forth in the profile, where Lee obtained his undergraduate degree.

37. On Sunday, March 15, 2009, Lee contacted fellow Valspar employee Individual A by telephone and advised that Lee was going to resign his Valspar employment on Monday, March 16, 2009. Lee told Individual A not to discuss Lee's resignation. Lee also talked to Individual A about the possibility of Individual A coming to work for Lee in the PRC. Individual A is a company scientist responsible for colorants, coordinating lab projects and test methods, and paint manufacturing. Individual A has access to Valspar's trade secret information.

38. Lee has booked a one way airline ticket on United Airlines flight 835 from Chicago O'Hare International Airport to Shanghai, PRC scheduled for departure on March 27, 2009 at 10:00 a.m.

### THE SEARCH OF THE PREMISES

39. On March 26, 2009, FBI executed a federal search warrant of the Premises and found the following electronic devices: 5 laptop computers, 1 desktop computer, 12

external hard drives, approximately 48 Compact Disk Recordable, approximately 30 DVD-Rs, 14 thumb drives, 6 San disk cards, 5 mp3 players, 2 Sony Play Stations (which are capable of data storage and one of which was a smaller portable version), 2 cellular telephones, 1 blackberry, and 1 camcorder.

40. One thumb drive found in a packed in carry-on luggage bag contained approximately 214 documents, in the form of spreadsheets and PDF documents, which contained various paint formulas. Lee's Valspar supervisor, Paul S. Sara, has verified that at least three of these documents contain trade secrets in the form of paint formulas and are marked "Valspar Confidential/For Internal Use Only." These paint formulas relate to products made, bought, and sold in interstate commerce by Valspar. Sara further verified at least one of the documents containing trade secrets in the form of paint formulas would not have been information needed or used by Lee in his ordinary course of employment at Valspar. In other words, the trade secret was not pertinent to or involved any products or projects on which Lee worked on or was responsible for while employed at Valspar.

## CONCLUSION

41. Based on the above information, there is probable cause to believe that Lee did knowingly steal, or without authorization appropriate, take, carry away or copy, duplicate, download, and replicate a trade secret that is related to or included in a product that this produced or placed in interstate or foreign commerce, for the economic benefit of anyone other than the owner of the trade secret, intending or knowing that the offense will injury any owner of that trade secret in violation of Title 18, United States Code, Section 1832.

FURTHER AFFIANT SAYETH NOT.

_____
ERIC D. SHIFFMAN,
Special Agent, FBI

Subscribed and sworn
before me this 27th day of March, 2009

_____
Honorable Sidney I. Schenkier
United States Magistrate Judge